The next case, number 221915, Rachel Doucette et al. versus Carol C. Jacobs et al. At this time, would counsel for the Doucettes please introduce yourself on the record. Good morning, Your Honors. May it please the Court, my name is Jacqueline Dougherty, and I represent the petitioners and their minor son in this matter. Before I begin, I would ask the Court if I may please reserve two minutes for rebuttal. Did you say two? Two, please. Yes, you may. Thank you so much. This matter arises out of a final judgment entered in the Massachusetts District Court following the granting of summary judgment in favor of the respondents on all counts. This morning I will address five key points that demonstrate why this Court should find in favor of the petitioners and overturn the District Court's decision. One, the timeline of key events and record evidence show that virtually all material facts are genuinely disputed and that taken in the light most favorable to the petitioners as the non-moving parties, the defendants are not entitled to summary judgment, and the review of that by this Court is de novo. Two, prior to the 2002 extended school year program, the 2012 summer program, B.D. was a 5-year-old vulnerable disabled child with isotocentric chromosome 15Q duplication disorder. Excuse me. I think you should assume that we know the facts. Obviously, they're quite important. I'd just like to ask you very directly, what is your theory of the 504 claim? I'm struggling to understand what is left of that claim. The service dog issue is apparently gone. You spend less than a sentence explaining that 504 claim in your brief. So what is left of it? Respectfully, I'm struggling to understand how that claim is even still in the case. Yes, Your Honor. My understanding from the brief, I believe there were a few paragraphs that referenced this. The reason that it's not explained in greater detail is because the substance of those claims is contained in the larger argument. And the issue is that Section 1983 was breached in a manner that shocks the conscience, and that in and of itself is a violation of Section 504. You mentioned shocks the conscience. Do you have any case on point from anywhere similar facts as to this? Because shocking to the conscience, in my experience, it's very, very hard to reach that threshold. Yes, Your Honor. It is a difficult threshold to reach. We do acknowledge that. I don't have a case with a similar fact pattern, but that doesn't mean that this fact pattern doesn't shock the conscience. I would bring the Court's attention to the timeline of events, and I think that this is what's so important. There are isolated issues that on their own, on their face, question of fact for the jury that they shocked the conscience, but taken in conjunction with the other events, I think that this is where you really see that this is the issue for the defendants. We have a school district that decided in February they were going to move the placement of the summer program. And this isn't just deciding we're going to put summer camp in a different location or summer school is going to be at a different location. The placement for this child with these severe disabilities is an IEP requirement. That IEP required that he be at the Pearly School. When the school unilaterally decided to change that placement to the Penbrook School, they were left with two options. One, they can immediately notify the parents to give them an opportunity to find an out-of-district placement that was appropriate for this child who had, as you've seen from the facts, an IEP with a list as long as my arm. Or, they then had an affirmative obligation to make sure that the Penbrook School was equal to the Pearly School in its ability to meet all of this child's safety needs, seizure needs, medical needs, and IEP requirements. Now, you have that. The school does nothing. They don't tell them. We then have a series of evaluations that are done by the school in March and April where the school is informed he needs predictability and routine. Things such as change in school cause him stress and anxiety and this can trigger seizures. They need to be very careful because dysregulation can be triggered by stress and changes. We then have an IEP meeting with the parents on April 9th. This is two months after the school has decided to change. Now, I understand that my sister has stated in her brief that there's no evidence of that, but I would direct your honors to the email of February 20th by the defendant stating the decision had already been made. We have an IEP meeting on April 9th at which time no one tells the parents, by the way, we have unilaterally changed the placement. The parents are still completely unaware. They find out several weeks later because they happen to be watching a televised school committee meeting. At that point, counsel, it seems I understand the position that the school failed to adhere to some of the important requirements of the IEP. And there's a debate that goes on for years between the parents and the school. And taking the evidence in the light most favorable to your client's position would suggest that there were failures. But there was an ongoing dialogue all these years. I mean, it seems to me there is no evidence that the school was being indifferent, didn't care, wasn't trying to be responsive. They may have failed in significant ways. But to translate that into shock the conscience kind of behavior, that's I guess I share Judge Helpe's concern. That seems a real stretch here. Deficiencies, yes, but deliberate indifference. How do you read deliberate indifference into this dialogue that took place over years? Your Honor, I agree with you that the history prior to the summer of 2012, that reading is reasonable. That there is this ongoing dialogue and all of these attempts. I think that we have to look at the summer of 2012 as different. And I would like to direct you to some very specific occurrences from that summer. Because these are more than just the de minimis failures that would be acceptable in an IEP. These are failures to implement a substantial significant portion of his IEP and they had notice of this. So if we take a look at some of the occurrences that summer where we have leading up to, we're now three, four months after the decision has made to change the placement. The parents don't have an opportunity to get him into another program. We have e-mails just a few weeks before this starts where the principal of the school is writing to her colleague saying, I'm concerned that as these people are being hired, his aides and teachers, they're not being trained. And then she goes on to say, but perhaps I'm wrong, maybe it's not a requirement. That the people working with this student whose IEP required ABA training, IEP training, behavioral training, seizure training, medical training. But she's expressing a concern about whether the training is required or not. That sounds like exactly the opposite of deliberate indifference. Except that that's weeks before the program starts and then they do nothing. They don't do that training. They don't hire people who are qualified. And then when we have e-mails where in response to the mother asking just to do a walk-through with the dog, we have administrators responding, forwarding her e-mail on to other employees, mocking her and saying, let the games begin. Mocking this woman who's just simply asking to tour the school with the dog. We then also have a situation where by the time of the fourth seizure, so we also have this issue where the respondents would have you believe that all of the seizures he experienced prior to the summer and the seizures that he experienced that summer are essentially the same thing. But in the record from the school nurse, we see that the earlier seizures are just staring seizures. One, two, maybe three seconds long and he goes back to what he was doing. That summer we have a first seizure that he is unconscious for 40 minutes convulsing. It's listed by the EMTs as grand mal convulsive seizure. We have a second seizure that is 25 minutes long. He is unconscious for 25 minutes convulsing. We have a third, which is 23 minutes long, convulsing, unconscious. We have a fourth seizure that is 15 minutes long, unconscious, convulsing. By this court's own decision in Doucette in 2018, simply the duration of those seizures makes them life-threatening because they're longer than five minutes. So after those four seizures, we have this child's neurologist write a letter to the school, the school receives it and says, this school cannot keep this child safe. I recommend he be kept out of school until we can find an appropriate placement. Six days later, the superintendent emails the parents and says, if you keep your child out of school, we will consider that truancy. That's conscious shocking. Wasn't there more to the story, though? What happened over the next two weeks? I don't know how you mean. Sure. In other words, there was no truancy claim filed. The parents agreed that they would send him. Right. And that's why there wasn't truancy. At that point, they're faced with potential criminal action, legal action for keeping their son out on the recommendation of their neurologist. I would also just, if we want to talk about things that shock the conscience, I would direct the court to the record appendix, pages 2229 through 22231. This is a picture of the slant board. There's been a lot of discussion made about the fact that the respondents claim that this student didn't have his favorite reinforcers, didn't have his favorite pieces of equipment. But we have evidence in the record that by the end of July, he still doesn't have a waiting chair required by his IEP, a sand table required by his IEP. He's not getting his three hours of DTT every single day required by his IEP. Let me ask you all these examples. Let's assume we uphold the district court's not shocking to the conscience. Do any of the other claims survive based on these facts? All of them survive. Because the Massachusetts ones, I believe, they're for negligence. Correct. And so their negligent actions are why this occurred. They're conscious shocking, but they're also negligent. My time is getting short, so I would just like to make two quick points, one of them being if you look at those pictures of this slant board, we're in the second week of school here. The mother is now at school because this child had a 40-minute unconscious convulsing seizure. And she witnesses the fact that in the second week he still has no slant board. And she testifies the slant board is used for him to lean his hand on while he's writing. And instead of going over to the other school and getting his slant board, his teacher makes one out of cardboard. And I'm not submitting any evidence, but this is what this looked like. It's in your packets. It's page 2231. This is conscious shocking to a child who's supposed to have limited visual stimuli, who needs to rest his hand on that board. And then there's testimony that it's several more days before they bring over the slant board, sometime in the second or third week. And they're claiming that he was never without these. The last point I would just like to make. Counsel, excuse me. This is on the causation issue, and I think it's important. You rely very much on the report of Dr. Ming. And she seems to be saying that he had these very severe convulsive episodes during the summer. Once he leaves that summer program, this never happens again, which I think is offered as proof that there is that causal relationship between what happened that summer and these episodes, and yet the reports indicate that two years later he had, in a different setting, a severe psychotic episode, which required, I think, hospitalization for three months. Although there's an attachment to Dr. Ming's report which describes that incident, she does not account for that at all. The district court points that out. I mean, how can she in her causation analysis overlook the significance of that episode that occurs two years later where he has what's described as a serious psychotic break? Your Honor, to that I would make two points. One, that would be a great question for cross-examination at trial. And two, there is evidence on July 26, Dr. Siebert, in the medical record, after the first two seizures, states that BD, quote, continues to make developmental progress overall, just as he says afterwards. The fact that he's making progress overall does not mean he has suffered severe regression and that he's not now making progress from his reduced baseline. It says he continues to make developmental progress overall. He has, unfortunately, regressed in his development over the summer with less academic support and is now having difficulty with his letters. That right there is evidence of regression. They claim that there is no regression and, therefore, there are no damages. The five seizures alone are damage. On top of that, we have evidence of regression from his neurologist in the medical record after the second seizure. We then have Ched, Naomi Ched, who is a BCBA LMCH, pardon, licensed mental health counselor, and she's describing the trauma that he experienced from that. So those are evidence of damages. Additionally, his mother testified that he'd never had a psychotic event prior to these seizures. And the question of whether or not that psychotic event is related to the seizures is a question for cross-examination. And all of that is a question of fact for the jury. I would just like to make one final point. Thank you. I think your time is up. You have some time for rebuttal, I believe. Thank you, Your Honor. Thank you, counsel. At this time, if counsel for the appellees will please introduce herself on the record. Yes. Good morning, Your Honors. May it please the Court, I am Alexandra Gill. On behalf of the defendants, Georgetown Public Schools, Georgetown School Committee, the Town of Georgetown, Carol Jacobs, Kathleen Estep, Margaret Marr, and Donna Strait. Counsel, if I could ask you just the same question I asked opposing counsel. Let's assume you prevail on the substance of due process claim. Isn't there a genuine issue of material fact as to at least negligence under Massachusetts law? No. Your Honor, that brings me to the causation piece that I intended to bring up with you today. Okay, so bring it up and just answer it at whatever point you want, but it's my question. Thank you. I will address it right now. In fact, I think causation is maybe the most efficient way to attack this appeal, and there are several other grounds on which I think the Court could affirm the district court's grant of summary judgment. But in this case, we start with a child who has severe cognitive and behavioral deficits, and we end with a child who has severe cognitive behavioral deficits. In the in-between, B.D. was a student at Georgetown Public School, as you know, and he attended their extended year program, and that program was extended even further for him. He went a week earlier, he went a week later, and he was the only student in the school at that time. B.D. happens to be diagnosed with a very complex chromosomal disorder that I know you've read about, so I won't go into detail about it, but there are multiple layers of causation that come up when we are discussing whether or not the DUSETS claims should be tried. As a result of B.D.'s disabilities and deficits, he was entitled to an individualized education program under the IDEA, and that IEP was intended to provide him with FAPE, a free and appropriate public education. And the hard truth about the IDEA is that it doesn't guarantee the best, it doesn't guarantee the highest quality facilities or the best trained specialists in the area who could help a child with disabilities. Counsel, excuse me, I want to ask you about the follow-up to Judge Helpe's question about the causation issue. I mean, it's clear that the appellants do rely on the expert report of Dr. Ming to support the causation claim. The district court is very critical of Dr. Ming's report, so much so that she essentially attaches no credibility to it. Now, the district court is entitled to do that on summary judgment, but it has to do it in a way that is compatible with the summary judgment standards, the way we're supposed to treat summary judgment. This is what the district court says on page 51 of its decision, again, being very critical of Dr. Ming's report. The court says, and Dr. Ming is talking about what happened that summer and the effect it had on BD's stress and anxiety, and the court says, the determination that the events at GPS would have caused BD's stress is not without question. In fact, the defendants have submitted the expert report of Dr. Sevcik, who opined in part. And so the court then quotes what Dr. Sevcik says, which differs, of course, from what Dr. Ming said. And it seems the district court credits Dr. Sevcik's version of the events and not Dr. Ming's. How is that compatible with the way in which the court is supposed to apply the summary judgment standards? The court says there's a question, Dr. Ming says one thing, Dr. Sevcik says another thing. I think Dr. Sevcik's got it right, which is essentially what the court says. How is that compatible with the way in which the court is supposed to deal with a conflict between experts at summary judgment? And let me add to Judge Lopez's question from my former perspective. When you have two experts, what the district judge has to do is to make sure they qualify on the rule, it's reliable, it's relevant. It seems to me, following Judge Lopez's questions, what the judge there was choosing between experts. And that's what used to happen before Daubert, before the rules were amended. Yes, Your Honors, I think it's a fair question. But I think in this case, the district court did not in any sense weigh the differing expert opinions. What I think the district court, if I could put myself in the court's shoes, it excluded and recognized as without weight or without any causal nexus. There's no legal sufficiency to Dr. Ming's expert report. And then, therefore, looked to the defendant's evidence and said that it met the burden for summary judgment. I don't think that's... Yes. Yes, Your Honor. I think... Precisely, Your Honor. And permissible at summary judgment, and that Daubert is not a strictly time of trial application or phenomenon. I prefer those words. When you look at Dr. Ming's opinion or expert report, you see an incredible amount of flaws. And first of all, inconsistencies. She describes teachers as toxic... I'm sorry? Right. Absolutely. I think that is, and I think the district court said it best, the Federal Rule 702 requires of experts. I also noticed that my sister did not include that in her brief. It seems to be a part of the past that the Doucettes would like to forget. But it very much happened that he returned from each seizure to Georgetown Public Schools, to the Pembroke four times with no known deficits. The record shows no evidence of any kind of behavioral or cognitive delays in the immediate interim. Then after the fifth one, everybody had kind of said enough. Even though your doctors don't know why you're having seizures, we want to do something because things have gotten out of hand. And with that, they agreed to send him after the fifth seizure on the first day of school at the new location, which was no longer even Pembroke. It was at the new school that was actually familiar to him. He had gone there as a kindergartner. They sent him for a 45-day assessment at GLEC, Greater Lawrence Educational Collaborative, I believe. And he remained there for nearly two years and was doing well. According to Dr. Thiebert, he was doing well and there's no evidence that he was struggling or had regressed in any way. All of a sudden, one day, he came home. I believe it was in March 2014. He came home or he had to be taken out of school and was hospitalized for a psychotic episode that required three months of inpatient hospital care and subsequently institutionalization at Berkshire Meadows. So Dr. Ming's report fails in many, many respects that I perhaps don't need to go into, but it certainly fails fatally in that one particular area. That would sort of go to the causation issue you were mentioning, right, that fail in the report? Yes, Judge Halvey. That's exactly right. I think the standard for the negligence causation would also bar the claims from proceeding past the summary judgment phase. And that causation would also go to a Rehabilitation Act claim. And those are also recklessness, but it would be the same analysis for all those non-substantive due process claims. That's correct. That's correct. There are some other issues that are lingering. I don't know if the Court is willing to entertain any argument on the Section 504 argument, given the earlier comments. But as you know, this case has been here before and it related to a service dog. I would like to point out that the mother and service dog were with BD for seizures two through five in this case. I would like to point out that nobody ever noticed any behavioral dysregulation or apparent stress that was being caused by anything that might have been inconsistent in the program. Not by his mother, not by the dog who was supposedly trained to recognize seizures. Counsel, maybe I should ask, opposing counsel is in rebuttal, but given the centrality of the service dog issue in the first go-round, it is somewhat surprising that it's now disappeared from the case. Do you have an understanding as to why that happened? If I had to speculate, it would have been a fairly broad gunshot pleading of 504 and a vetting of whether or not there might be evidence of intentional discrimination based on BD's disability. I do not believe the record has any intentional, any evidence of any discriminatory animus. I guess as a factual matter, it turns out that the dog was present when four of these seizures took place. And the dog never, to the extent that the dog was supposed to be helpful in anticipating them, the dog never alerted to the imminence of any of these seizures. As a factual matter, is that correct? That is absolutely correct. Georgetown and the defendants welcomed the dog into the doors, even though there was a discussion of whether or not there would be a functional behavioral analysis. They didn't exactly welcome the dog. You can have the dog if the mother comes with the dog, right? Yes, but they initiated the conversation. They said we can't wait to, you know, can you bring him in, let's start talking about how we can make this work. So in my mind, that is a bit welcoming. And there was a discrepancy over who might pay for the handler. Certainly the parties agreed that BD could not serve as the handler for the dog himself. The Doucettes wanted watering and walking. But many services that I don't think are contemplated in the recent two cases that deal with service dogs. But I would say that the dog accompanied and did not alert to any seizures. And that is sort of an interesting twist to this, because it did seem at first like the case related to the dog. And my personal view is that that argument has since been waived. And any argument related to 504 has been waived. With respect to the state law claims, Your Honors, I think we touched on that. But similar to the lack of any discriminatory animus with respect to the 504, the Section 504 claim, there's no evidence of any intentional animus towards BD. Certainly nothing that would even come close to rising to the level of extreme and outrageous, which is the standard in Massachusetts. And I would actually suggest to you that when you look at the tomes of e-mails and thousands of communications and lengthy correspondence back and forth, and often met by the Doucettes with quite a bit of sharp tongue, I think that this record really evidences the defendant's labor of love for BD and how much they cared about him and how much they were dedicated to providing him with the services they knew he was entitled to under the IDEA. I would also add that, if Your Honor would allow me to, there were a couple of things in Dr. Ming's report with my time so short. We do have your brief. Yes, you do, Your Honor. I think I'll then rest on it. Thank you very much. Thank you, counsel. If the counsel for the appellant would please reintroduce herself on the record to begin. Good morning again, Your Honors. Jacqueline Daugherty for the petitioners. I would just like to make a few very brief points. One, I'll go backwards. Regarding the dog, the purpose of the dog was not to alert staff to seizures. The purpose of the dog was to help keep BD calm. And the first seizure we see is 40 minutes long. Once the dog is with him, his seizure time cuts about in half. So he goes from being unconscious for 40 minutes to being unconscious for 25, 23, 15, and four minutes. That alone is potential evidence that the dog was helpful. That was not the purpose of the dog. The dog is for him to access his education and feel safe. The dog is just one aspect of the 504 claim. It's one piece that shocks the conscience, because they were refusing to allow this dog when he had had the service dog for over nine months, that when the mother brings the dog, the response by the administration is let the games begin. So that's just one aspect. I don't know what's left of the 504 claim. It sounds like it's just now, unlike before. Now it's just another way of labeling the denial of a fate, which then creates all sorts of problems for you in terms of exhaustion of administrative remedies. I just don't recognize the 504 claim anymore. Well, we did reference it in our brief. I understand that Your Honor doesn't feel that we gave it justice, but it has been referenced in the brief, so I would state that it hasn't been waived. As I have just 30 seconds left, I would like to make one final point that Dr. Ming does reference on page 14 and 15, several medical and situational things that occur in 2014. And on page 15 of her detailed factual summary that she offered, she does discuss the psychotic episode, which I would point out is not a seizure and does not carry the same risks that his seizures did. Last thing I will say is that in Cortez-Irizarry, this court warned against eliminating precluding expert testimony at the summary judgment stage. This court said that there are options, such as in limine hearings, such as ordering experts to submit serial affidavits. The district court didn't do any of that. It said in limine hearings and the serial affidavits, which weren't even done here, that sometimes the game will not be worth the candle. Although it's not going to be in limine because there's summary judgment granted. That's why that doesn't come into play. Well, there's also the option to have asked for such affidavits. And here, where, as Your Honors pointed out, the district court judge did actually weigh the competing opinions of the respondents. So let me ask this. Even if this report is arguably weaker than the other, should that be an issue for the jury to weigh? Because once the gatekeeping function is done, the judge doesn't weigh the report. It's the jury's function, and you treat them just like any other witness. That's what your suggestion should have happened here. Absolutely. Although, if there had been an in limine hearing or if the judge had asked for affidavits and had a question about that psychosis, or if the judge somehow didn't factor in the 15-page detailed factual analysis, then those could have all been questions at an in limine hearing or for cross-examination. And here, we didn't have any of that occur, and we did actually have the district court saying, we have Dr. Ming saying this, we have the defense experts saying this, and I find the defense experts persuasive. And that is not the summary judge's standard, and it's absolutely inappropriate even on 702. What you're suggesting is, pre-Dolbert, just weigh herself who the best expert was, and that's it. I'm sorry, I didn't hear the question. Before Dolbert and the rules, it was that the court would basically say, this expert's going to be admitted and not admitted, not under the rule 702 analysis. That's what happened here, correct, in your view? Essentially, yes, or if 702 was the idea, it was done incorrectly. Let me also ask, if the expert report had been considered, there would have been, forget about the substance of due process claim, at least for the others, issues of material facts, genuine issues. Absolutely. I mean, the district court even goes through and says repeatedly. The Ming report is crucial to you being able to really generate issues of material facts. I would disagree. I think the Ming report is obviously important. It's just one more issue, but still you understand there's issues of material facts? Yes.